# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

SUSAN K. SERSEN,                                    CIVIL NO. 05-2816 (JRT/AJB)

        PLAINTIFF,

V.                                                 REPORT AND RECOMMENDATION ON THE
                                                   PARTIES' CROSS MOTIONS
                                                   FOR SUMMARY JUDGMENT

JO ANNE B. BARNHART, COMMISSIONER OF
SOCIAL SECURITY,

        DEFENDANT.

---

Fay E. Fishman, Esq., for Plaintiff, Susan K. Sersen.

Lonnie F. Bryan, Assistant United States Attorney, for Defendant, the Commissioner of Social
Security.

---

## I.    INTRODUCTION

Plaintiff Susan K. Sersen ("Plaintiff") disputes the unfavorable decision of the Commissioner of

the Social Security Agency ("Commissioner") denying her claim for a period of disability and disability

insurance benefits under Title II of the Social Security Act.  This matter is before the court, United

States Magistrate Judge Arthur J. Boylan, for a report and recommendation to the District Court on the

parties' cross motions for summary judgment.  *See* 28 U.S.C. § 636 (b)(1) and Local Rule 72.1.

Based on the reasoning set forth below, this Court **recommends** that Plaintiff's Motion for Summary

Judgment [Docket No. 7] **be granted** and that the Commissioner's Motion for Summary Judgment

[Docket No. 19] **be denied**.

II.     **ISSUES BEFORE THE COURT**

The primary issues before the Court are: (1)  whether Administrative Law Judge ("ALJ") Roger

W. Thomas failed to follow the Order of the District Court on remand; (2) whether the ALJ erred in

not giving the appropriate weight to the record in his assessment of Plaintiff's credibility; and (3)

whether the ALJ posed an appropriate question to the vocational expert.

III.    **PROCEDURAL HISTORY**

Plaintiff filed an application for Disability Insurance Benefits ("DIB") on November 16, 1999,

alleging disability as of August 21, 1998.  (T. 142.)  The state agency denied Plaintiff's claim initially

and on reconsideration.  (T. 101-110.)  Plaintiff made a timely request for a hearing. (T. 111-112.)

On August 24, 2001, ALJ Thomas conducted an administrative hearing regarding Plaintiff's

application for DIB.  On September 17, 2001, ALJ Thomas denied Plaintiff's application for benefits.

(T. 11-27.)  Plaintiff filed a request for review to the Appeals Council.  The Appeals Council denied

review, making ALJ Thomas' decision the final decision of the Commissioner.  Based on the

Commissioner's final decision denying DIB, Plaintiff filed an action in this Court to reopen the matter.

Both parties filed motions for summary judgment.  On August 19, 2003, U.S. District Court Judge Paul

A. Magnuson issued an Order remanding the matter to the Commissioner for further consideration.  (T.

496-500.)

On June 8, 2004, ALJ Thomas held a supplemental hearing to further consider Plaintiff's

application for benefits.  On August 23, 2004, ALJ Thomas denied benefits.  (T. 436-453.)  Plaintiff

filed a request for review to the Appeals Council.  (T. 432-435.)   The Appeals Council denied review, making ALJ Thomas' decision the final decision of the Commissioner.  (T. 428-431.)  On December 6, 2005, Plaintiff filed an action in this Court to reopen the matter.  Both parties filed motions for summary judgment.

**IV.     FACTUAL BACKGROUND AND MEDICAL HISTORY**

Plaintiff was born on February 10, 1958, and was 45 years old at the time of the supplemental hearing before ALJ Thomas.  (T. 15, 560.)  Plaintiff has a high school education.  (T. 15.)  She previously worked as an assembler and a cleaner.  (*Id*.)  Plaintiff alleges disability from right-sided pain in the neck, shoulder, arm, and hand; back and hip pain; migraine headaches; fibromyalgia[1]; and hypertension.

On  May 13 1998, Plaintiff saw Dr. Komoto for neck and shoulder pain (T. 332.)  Plaintiff reported that the onset of the pain began in July 1992 when she suffered an injury at work.  Dr. Komoto noted pain on palpitation to her neck.  (*Id.*)   Dr. Komoto diagnosed Plaintiff with persistent cervical and trapezius pain with numbness into her right hand.  (*Id.*)   Dr. Komoto referred Plaintiff for physical therapy.  (*Id.*)  On May 19, 1998, Plaintiff started physical therapy and reported  that she "had intermittent but continuing pain on the right side of her neck and shoulder with radicular symptoms down to her hand."  (T. 251.)  After eight visits, Plaintiff had not responded favorably to treatment.  (T. 247.)

---

[1]Fibromyalgia is defined as "any of a group of rheumatic disorders affecting soft tissues and characterized by pain, tenderness, and stiffness of muscles and associated connective tissue structures." *Merriam-Webster Online* at http://www.m-w.com/dictionary/%20fibromyalgia.

On June 18, 1998, Plaintiff saw Dr. Komoto and reported that the pain was worse than it was before physical therapy, and that she had pain and numbness through her fingers. (T. 329.)  An MRI showed an annular tear at C-7 and degeneration of C5-6, but was otherwise normal. (T. 254-56, 337.)

On September 3, 1998, Plaintiff saw Dr. Jack Hubbard at the Minneapolis Clinic of Neurology for neck and shoulder discomfort.  (T. 244-46.)  Plaintiff believed that the physical therapist tore a disk in her neck.  (T. 244.)  Plaintiff reported that her pain was much more severe than it had been in the past.  (*Id.*)  A general examination showed some restriction of Plaintiff's head and neck and "prominent myofascial trigger points over the right posterior cervical and super scapula regions."  (T. 245.)  Dr. Hubbard recommended myofascial trigger point therapy on an every other day basis for three to four weeks and trigger point injections.  (*Id.*)   Dr. Hubbard indicated that he thought it may be reasonable for Plaintiff to refrain from working until he saw her in a follow-up examination.  (*Id.*)   Plaintiff began physical therapy at the Institute for Athletic Medicine.  (T. 258-77.)  She reported her pain as an eight out of ten and had slight improvement of her overall range of motion.  (T. 260.)  However, after several treatments, the physical therapist noted that Plaintiff had reached a plateau. (*Id.*) The physical therapist noted in her discharge note that Plaintiff "has not made progress toward functional/objective goals."  (T. 258.)

Plaintiff saw Dr. Komoto in October 1998 and reported that she had some improvement with her neck and shoulder pain. (T. 290.)  However, she indicated that she had two severe migraine headaches while in physical therapy which required treatment at the emergency room (*Id.*)  An examination revealed that Plaintiff had "persistent myofascial trigger points in the right suprascapular region."  (*Id.*)  Dr. Hubbard opined that Plaintiff was "making slow but definite progress" and suspected

that she had "a mixed profile of migraine headaches associated with muscular pain." (*Id.*)  Dr. Hubbard

indicated that Plaintiff should not return to work until she improved further.  (*Id.*)  Dr. Hubbard

prescribed Imitrex[2] for Plaintiff's headaches and recommended that Plaintiff continue with physical

therapy and trigger point injections.  (Id.)

On November 28, 1998, Plaintiff saw Dr. Hubbard and reported some improvement and that

overall she was "about 25% better." (T. 241.)   Dr. Hubbard recommended that Plaintiff "return to

work for four hours per day, with frequent breaks, at least once an hour" and participate in a Back to

Fitness Program.  (*Id.*)

Plaintiff followed up with Dr. Komoto in December 1998 for neck and back pain.  (T. 322.)

Plaintiff rated her pain as a seven out of ten.  (*Id.*)   Dr. Komoto diagnosed Plaintiff with fibromyalgia

and chronic cervical pain.  (*Id.*)  Dr. Komoto recommended that Plaintiff continue with physical therapy

and pain medication.  Dr. Komoto issued a note that Plaintiff not return to work until a follow-up in

mid-January.  (*Id.*)

Plaintiff began a fitness program on December 8, 1998 for conditioning and strengthening.  (T.

239.)  The therapist noted that Plaintiff demonstrated "significant reduced range of motion in all of the

cervical musculature and with her right shoulder . . ." and had "very poor grip strength in her right hand .

. ." (*Id.*)  The therapist recommended "the use of a therapeutic pool program prior to any additional

physical therapy or the use of the Back to Fitness Center program."  (T. 240.)

_____

[2]Imitrex "is prescribed for the treatment of a migraine attack with or without the presence of an aura (visual disturbances, usually sensations of halos or flickering lights, which precede an attack)." **The PDR Family Guide to Prescription Drugs**, Three Rivers Press (8th ed. 2000).

In January 1999, Plaintiff saw Dr. Komoto and reported severe pain. (T. 321.) Dr. Komoto recommended that Plaintiff continue with pain medications and pool therapy. (*Id.*) Dr. Komoto wrote a note restricting Plaintiff from working until March 1999. (*Id..*) In February 1999, Plaintiff reported continued pain in her neck and arm. In March 1999, Dr. Komoto extended Plaintiff's off work restriction until May 1999 and recommended continued physical therapy. (T. 319.)

On May 13, 1999, Plaintiff underwent a functional capacity assessment ("FCA") at the Minneapolis Clinic of Neurology. (T. 281-87.) Eugene Kay, Assessment-Specialist, conducted the FCA which tested Plaintiff's physical capabilities and her tolerance for physical activities. (T. 281.) Mr. Kay indicated that the test results were a "conditionally valid representation" of Plaintiff's physical capabilities because he believed there were some inconsistencies in the testing procedure. (*Id.*) Mr. Kay noted that such inconsistencies resulted from Plaintiff's perception of her capabilities and pain threshold, or from the Plaintiff's "extremely low physical capabilities." (*Id.*) Mr. Kay concluded that Plaintiff could work part-time at a sedentary level with the following restrictions: sit up to 45 minutes at one time and stand for 30 minutes at one time. (T. 280-81.) However, she was "not to do either of these for more than three to four hours per shift." (T. 281.) In addition, Mr. Kay indicated that Plaintiff should lift no more than 10 pounds, carry no more than 5 pounds, and avoid repetitive or forcible work with her hands and arms. (*Id.*)

In June 1999, Plaintiff saw Dr. Komoto for continued neck and shoulder pain. (T. 311.) Dr. Komoto noted that Plaintiff had finished her physical therapy, "but continues to live with a lot of chronic pain." (*Id.*) Dr. Komoto also noted that Plaintiff had a high blood pressure because she was in pain. (*Id.*) In September and October 1999, Plaintiff was treated for foot pain. (T. 298-300, 309-10.)

6

In November 1999, Plaintiff reported to Dr. Komoto that she had increased neck pain, headaches, and foot pain. (T. 309.) Dr. Komoto noted that Plaintiff had diffuse pain throughout the joints and a "decreased range of motion in the neck." (*Id.*)

On January 11, 2000, Plaintiff underwent a psychiatric examination. (T. 338.) Plaintiff reported "constant, persistent, severe pain in her neck and arm." (*Id.*) In addition, Plaintiff reported diminished concentration and memory and that she was depressed. (T. 339.) Dr. Alford Karayusuf concluded that Plaintiff "is able to understand, retain, and follow simple instructions" and "is restricted to brief, superficial, interactions with fellow workers, supervisors, and the public." (T. 340.) Dr. Karayusuf also opined that Plaintiff is capable of maintaining pace and persistence with "simple, routine, repetitive, tangible tasks." (*Id.*)

Plaintiff continued to undergo treatment with Dr. Komoto for neck, back, and shoulder pain. (T. 377.) In September 2000, Plaintiff went to urgent care for a severe headache with vomiting. (T. 405.) In October 2000, Dr. Komoto indicated in a note that Plaintiff "was unable to work due to chronic neck and shoulder pain due to a previous injury." (T. 372.)

On January 22, 2001, Plaintiff went to the emergency room complaining of a headache and vomiting. Dr. Joseph Borer gave Plaintiff Demerol[3] and Compazine[4] shots. (T. 374-75.) Plaintiff also sought treatment for severe headache with vomiting in March 2001. (T. 389.)

On February 7, 2001, Dr. Komoto completed a functional capacity assessment and opined that Plaintiff had the following restrictions: (1) lifting and carrying less than ten pounds; (2) standing and/or

---

[3]Demerol is narcotic pain reliever. *Id.*

[4]Compazine is used to control severe nausea and vomiting. *Id.*

walking at least two hours in an eight hour workday (with normal breaks);       (3) sitting less than six

hours in an eight hour workday (with normal breaks); and (4) unable to use her right arm for any

activity.  (T. 379-80.)  Dr. Komoto based his opinion on Plaintiff's "persistent and chronic cervical

neck pain, with right shoulder and back involvement" and pain that leads to migraine headaches.  (T.

379.)

On June 29, 2001, Dr. Komoto completed a Fibromyalgia Residual Functional Capacity

Questionnaire.  (T. 411-16.)   Dr. Komoto indicated that Plaintiff's impairments had lasted or can be

expected to last at least twelve months. (T. 411.)  Dr. Komoto opined that Plaintiff was capable of only

low stress jobs with the following limitations: (1) sit for about four hours in an eight hour workday (with

normal breaks); (2) stand/walk for two hours in an eight hour workday (with normal breaks.); (3)

Plaintiff would need unscheduled breaks every two to three hours consisting of five to ten minutes in

duration.  (T. 415.)   Dr. Komoto also opined that Plaintiff's pain would often interfere with her

attention and concentration.  (T. 413.)   Dr. Komoto based his opinion on Plaintiff's tenderness of the

neck at C6 and C7 and tender trapezius bilaterally. (T. 411.)  Dr. Komoto estimated that the Plaintiff

would likely miss work more than four times a month due to her impairments or treatment. (T. 416.)

In July 2002, Plaintiff went to the Bloomington Lake Clinic with complaints of a chronic

headache, neck pain, cervical strain, nausea, and vomiting.  (T. 531-32.)  Plaintiff was given 30 mg of

Toradol[5].  (T. 531.)  In September 2002, Plaintiff reported severe neck ache, headache, and nausea.

(*Id*.)  The doctor noted that Plaintiff was in pain while laying on the examination table and was sensitive

---

[5]Toradol is "a nonsteroidal anti-inflammatory drug and is used to relieve moderately severe, acute pain." *Id*.

to light.  (*Id*.)  She was given Toradol and a shot for pain and nausea.  (*Id*.)

In August 2003, Plaintiff saw Dr. Komoto for increased neck and shoulder pain which resulted from lifting certain items while helping her daughter move.  (T. 527.)  She also reported pain shooting down her arm into her fingers.  (*Id*.)  An examination revealed pain on palpation of the neck and shoulders.  (*Id*.)  Dr. Komoto diagnosed Plaintiff with "[c]ervical and arm pain with nerve root irritation" and prescribed narcotic pain medication.  (*Id*.)

## V.    TESTIMONY AT ADMINISTRATIVE HEARING

### *First Administrative Hearing*

The first administrative hearing took place before ALJ Thomas on August 24, 2001.  (T. 33.) Plaintiff was present and testified, as did Dr. Andrew Steiner, a medical expert, and Norman A. Mastbaum, a vocational expert.  (*Id.*)

Plaintiff testified that her driving is limited to ten or fifteen minutes because it is difficult for her sit longer.  (T. 41-42.)  She testified that she has pain in her hips which makes it difficult for her to walk more than fifteen to twenty minutes.  (T. 43-44.)  Plaintiff testified that she takes Elavil[6] to sleep at night, but still wakes up two to three times during the night due to pain in the neck and shoulder. (T. 45.)

Plaintiff testified about her daily activities.  (T. 47.)  She stated that she does not do any cleaning and cooks only once or twice a week.  (T. 48.)  Plaintiff testified that her daughter does the dishes and helps her with grocery shopping.  (*Id.*)  Plaintiff stated that she is depressed, lacks energy and lays around. (T. 49-50.)   She believes the depression is a result of her physical impairments.  (T.

---

[6]Elavil "is prescribed for the relief of symptoms of mental depression . . . [and] [s]ome doctors also prescribe Elavil . . . to control chronic pain, to prevent migraine headaches . . . ."  *Id.*

51.)   Plaintiff takes Wellbutrin[7] for her depression.  (T. 50.)   Plaintiff also testified that she can no

longer bowl, play softball, ride a bike, or canoe.  (T. 51.)

Plaintiff testified that she went to the emergency room five or six times with headaches since

1998.  Plaintiff's headaches start with neck pain which continues to her head and causes nausea and

vomiting.  (T. 55.)   Plaintiff stated that she has severe headaches five or six times a month which

require her to take Vicodin[8] and a muscle relaxer.  (T. 56.)

Plaintiff also testified that her last job was as a computer chip assembler.  (T. 73.)  Plaintiff

stated that she believed her physical therapist tore two disks in her neck which made her neck, hand,

and arm worse than they were before.  (T. 74.)  Plaintiff testified that the injury was verified by an MRI.

(*Id.*)

Plaintiff's husband, Charles Sersen, also testified at the hearing (T. 63.)  Mr. Sersen stated that

he has been married to Plaintiff for 24 years.  (T. 71.)  Mr. Sersen testified that the worst problem his

wife reports to him is that she gets severe headaches if "she tries to do anything too physical around the

house."  (T. 64.)  Mr. Sersen stated that Plaintiff will experience pain in her neck and then the pain goes

to her head, which leads to nausea and vomiting.  (T. 67.)  Mr. Sersen testified that Plaintiff experiences

severe headaches once a month which require her to rest in bed and take medicine.  ( T. 68.)  He also

stated that Plaintiff experiences extreme headaches four to six times a year that result in vomiting.  (*Id.*)

Mr. Sersen testified that Plaintiff was happy, very active, and an outgoing person before her injury.  (T.

---

[7]Wellbutrin is a used "to help relieve certain kinds of major depression.  Major depression involves a severely depressed mood (for 2 weeks or more) . . ."  *Id.*

[8]Vicodin is a narcotic pain reliever.  *Id.*

70-71.)

Dr. Steiner, independent medical expert ("IME"), testified about Plaintiff's various impairments. (T. 74-77.)  Dr. Steiner testified that Plaintiff's physical impairments did not meet or equal any listed impairments because the record did not contain findings of significant range of motion loss or neurological deficits. (T. 78.)  Dr. Steiner stated that Plaintiff's impairments limited her to lifting at the sedentary level with occasional overhead work and no right-sided, repetitive extended reaching.  (*Id.*) Dr. Steiner testified that in his review of the record, he did not find a neurological basis that would explain Plaintiff's weakness in the functional capacity assessment conducted on May 13, 1999 and attributed such weakness to "de-conditioning."  (T. 79.)  Dr. Steiner explained that the validity of a functional capacity assessment "hinge[s] on good participation and it can be [limited] depending on how involved the participant feels."  (T. 80.)  Dr. Steiner also testified that when individuals work beyond their perceived limits then they tend to perceive increased pain and problems.  (*Id*.)  Dr. Steiner also indicated that everyone experiences pain differently. (T. 82.)  Dr. Steiner testified that an individual may have problems concentrating on tasks when they are experiencing a lot of pain.  (T. 83.)

The vocational expert, Norman A. Mastbaum, testified at the administrative hearing.  (*Id.*)  ALJ Thomas posed a hypothetical question to the vocational expert ("VE") with regards to an individual of Plaintiff's age, education, and work experience and certain limitations identified in the record (depression, neck and back pain, migraine headaches, fibromyalgia , lifting restrictions at sedentary level, and completing simple, routine tasks with superficial contact with co-workers.)  (T. 84-85.)   The VE testified that Plaintiff would be able to perform her past relevant work.  (T.86.)  The ALJ posed a second hypothetical and added further limitations such as right gripping up to 10 pounds, pulling 7

11

pounds, lifting 7.5 pounds, sitting up to 45 minutes, and standing up to 30 minutes.  (T. 86.)  The VE

testified that Plaintiff would not be able to perform past relevant work, but could perform other work

such as machine tending, lens inspector, table worker, and spotter.  (T. 87-88.)

On August 19, 2003, Judge Paul Magnuson of the U.S. District Court issued an Order

remanding the matter to the Commissioner for further consideration.  (T. 496-500.)

*Supplemental Administrative Hearing*

A supplemental administrative hearing took place before ALJ Thomas on June 8, 2004.  (T.

560.)  Plaintiff was present and testified, as did Mr. Sersen, Plaintiff's husband, and Mitchell Norman, a

vocational expert.  (*Id.*)

Plaintiff testified that she no longer sees her doctor for her headaches, but  treats her headaches

at home based on her doctor's instructions.  (T. 568.)  Plaintiff indicated that she takes Vicodin three

times a week and a muscle relaxer for her pain and headaches.  (*Id*.)  Plaintiff explained that she

becomes drowsy at times when she takes her medication which requires her to lay down.  (T. 581.)

She stated that her headaches occur at the same frequency since she last testified.  (*Id.*)  Plaintiff also

indicated that she tries to take her medication at the first sign of pain and will go to bed.  (*Id.*)  She also

explained that her headaches are associated with vomiting.  (*Id.*)  Plaintiff testified that she has had

constant neck and shoulder pain, which increases with activity.  (T.  569.)   She stated that her right

arm is limited in function due to pain and she has trouble using it for lifting, reaching, and repetitive

movements.  (T. 579-80) .  Plaintiff explained that she does some household activities, but she is limited

by pain.  (T. 579.)  She testified that her pain started when she was hit by a ladder in the back of her

neck as she was cleaning a day care.  (T. 577-78.)   Mr. Sersen testified that Plaintiff sometimes will

uncontrollably drop items she is holding in her right hand such as a glass.  (T. 585.)  Mr. Sersen

described how he has watched Plaintiff cope with her pain, her trips to the emergency room, and her

vomiting in the middle of the night.  (T. 586.)  Mr. Sersen agreed with Plaintiff's testimony regarding her

good days and bad days.  (T. 585.)

Mitchell Norman, VE, testified at the supplemental hearing. (T. 588.)  ALJ Thomas posed a

hypothetical question to the VE with regards to an individual of Plaintiff's age, education, and work

experience including the following limitations: (1) depression; (2) neck and back pain; (3) right upper

extremity radiation, which has been diagnosed as myofascial syndrome and multi-level degenerative

disc disease; (4) "weakness at 4-F, 1, though not found that weakness, that is another exam, 6-F, and

some others"; (5) migraine headaches and muscular headaches; (6) fibromyalgia; (7) left foot pain; (8)

hypertension; (9) able to follow only simple instructions; (10) brief superficial contacts; (11) perform

simple, routine, repetitive, concrete, and tangible tasks; (12) lifting less than ten pounds; (13) standing

and walking for two hours; (14) sitting less than six hours; (15) unable to use her right arm for activities;

(16) no climbing or crawling; (17) occasional balancing, kneeling, and crouching; (18) no exposure to

"extremes of temperature, or noise, or vibration, or humidity, or hazards, or fumes, odors, chemicals,

[or] gases."  (T. 590-92.)

The VE testified that Plaintiff could not perform her past relevant work based on the

hypothetical posed by the ALJ.  (T. 592.)  The VE testified that the only job Plaintiff could perform

based on the ALJ's hypothetical was a position as a surveillance system monitor.  (T. 592-93.)  The

VE indicated that there were about 1,200 of those jobs.  (T. 593.)  The VE explained that he excluded

other jobs because Plaintiff is right hand dominant and she is unable to use her right arm for any activity

which "really pose[s] a problem [with her performing] any kind of machine operation, assembly type operations." (*Id.*) He further indicated that Plaintiff would not be able to perform jobs such as a telephone quotation clerk or other clerical jobs because she would not be able to do any writing or typing.[9] (*Id.*)

The VE stated that a surveillance system monitor is considered an unskilled job (SVP[10] or skill level two). (T. 595.) Plaintiff asserts that the DOT describes this job as semi-skilled, with a skill level of three. (Docket No. 8; T. 521.) The VE testified that his testimony was consistent with the Dictionary of Occupational Titles ("DOT"). (T. 594.) The VE stated that tolerated absenteeism in competitive employment is two absences per month and any absences in excess of this would eliminate competitive employment. (T. 595-96.). The VE testified that acceptable breaks in competitive employment consists of a fifteen minute break in the morning and afternoon and a thirty minute lunch break. (T. 596.) The VE stated that if an individual exceeded the number of acceptable breaks then this would eliminate competitive employment. (*Id.*) The VE agreed that the job of a surveillance system monitor required the presence of a person when they are scheduled to be there because these individuals are often scheduled to work alone. (T. 597.) The VE also agreed that the job of surveillance system monitor requires a person to concentrate during the job, react and alert others if

---

[9]The VE also testified to an additional hypothetical posed by the ALJ and indicated that if Plaintiff were able to use her right for anything except extended reaching, then she would not be able to perform past relevant work, but could possibly perform the position of plastic design applier (about 2,600 jobs available) and lens inspector ( about 1,100 jobs available). (T. 594.)

[10]SVP is the amount of lapsed time required by a typical worker to learn techniques, gather the information, and develop the ability for average performance in a specific job situation. *See* U.S. Dep't of Labor, Employment and Training Admin., *Dictionary of Occupational Titles.*

there is a problem identified during the surveillance. (*Id.*)  The VE testified that if a person can't

concentrate to do their job, then they can't do the job.  (T. 598.)

## VI.   THE ALJ'S FINDINGS AND DECISION

On August 23, 2004, ALJ Thomas issued his decision denying Plaintiff's application for DIB.

The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death or has

lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C.

§§ 416(i)(1)(A).  The ALJ followed the sequential five-step procedure as set out in the rules.  *See* 20

C.F.R. §§ 404.1520(a)(4) and 416.920(a).  The Eighth Circuit has summarized these steps as follows:

> The Commissioner must determine: (1) whether the claimant is presently engaged in
> "substantial gainful activity;" (2) whether the claimant has a severe impairment--one that
> significantly limits the claimant's physical or mental ability to perform basic work
> activities; (3) whether the claimant has an impairment that meets or equals a
> presumptively disabling impairment listed in the regulations (if so, the claimant is
> disabled without regard to age, education, and work experience); (4) whether the
> claimant has the residual functional capacity [RFC][11] to perform his or her past relevant
> work; and (5) if the claimant cannot perform the past work, the burden shifts to the
> Commissioner to prove that there are other jobs in the national economy that the
> claimant can perform.

*Fines v. Apfel*, 149 F.3d 893, 894-95 (8th Cir. 1998).

Based on the above, the ALJ determined that Plaintiff met the requirements for the first

two steps of the disability determination procedure.  (T. 445.)  The ALJ found that Plaintiff has not

engaged in substantial gainful activity since her alleged onset date of August 21, 1998.  (*Id.*)  Regarding

---

[11]A claimant's RFC is the most the claimant can still do despite the claimant's physical and/or
mental limitations.  20 C.F.R. § 404.1545.

the second step, the ALJ found that Plaintiff's alleged pain symptoms are considered "severe" based on the requirements in regulations.  (*Id.*)  Regarding step three, the ALJ found that Plaintiff was not disabled because the evidence in the record did not "meet or equal the severity of a listed impairment published in Appendix 1, to Subpart P, of Social Security Administration Regulation No. 4."  (*Id.*)

The ALJ then proceeded to evaluate Plaintiff's RFC.  ALJ Thomas determined that Plaintiff has the following residual functional capacity: (1) engage in a modified range of sedentary work activity, (2) lifting/carrying less than 10 pounds; (3)  standing/walking at least 2 out of 8 hours; (4) sitting for slightly less than 6 out of 8 hours during the course of a workday; (5) unable to use her dominant right arm for any significant activity; (6) limited in all fine and gross manipulative hand activity; (7) unable to tolerate exposure to temperature extremes, noise, odors, gases, or fumes; (8) work that is limited to simple instructions; (9)  brief and superficial contact with co-workers, supervisors, and the public; and (10) performing only simple, routine, repetitive, concrete, tangible tasks.  (T. 446.)

Based on the RFC, and considering Plaintiff's age, experience, and past work experience, and the testimony of the VE, the ALJ determined that Plaintiff could not perform her past relevant work, but that she could perform the job of a surveillance system monitor ( about 1,200 jobs available.)  (T. 450.) The ALJ disagreed with Plaintiff's assertion that  the position of surveillance system monitor is a semi-skilled job with an SVP of three which is beyond Plaintiff's RFC for unskilled work.  (T. 451.)  Instead, the ALJ relied on the VE's testimony that "the position of the surveillance system monitor is an unskilled job that primarily requires the individual to observe." (*Id.*)  Accordingly, ALJ Thomas found that Plaintiff was not disabled under the regulations imposed by the Social Security Act. (*Id.*)

## VII.   DISCUSSION

### A.      Standard of Review

This Court will affirm the ALJ's findings that the claimant was not under a disability if the findings are supported by substantial evidence based on a review of the entire record. *Haley v.Massanari*, 258 F.3d 742, 747 (8th Cir. 2001).  "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." *Id.* at 747 (quoting *Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998)).  The review the Court undertakes, however, must go beyond solely the examination of the record for evidence in support of the Commissioner's decision. *Id.* The Court must additionally examine the record for evidence that detracts from that decision. *Id.* Nevertheless, as long as there is substantial evidence to support the decision, this Court will not reverse it simply because substantial evidence exists in the record that would support a contrary outcome or because this Court might have decided differently. *Id.*

### B.      Analysis of Decision

Plaintiff argues that this Court should reverse the ALJ's unfavorable decision for three reasons. First, Plaintiff argues that the ALJ failed to follow the Order of the District Court on remand.  Second, Plaintiff argues that the ALJ erred in not giving the appropriate weight to Plaintiff's credibility.  Finally, Plaintiff argues that the ALJ posed an inappropriate hypothetical question to the vocational expert and the ALJ erred in his determination that Plaintiff has the residual functional capacity to perform competitive work in the national economy.

Remand Order

This Court is in the best position to determine whether an ALJ violated its mandate on remand. *Steahr v. Apfel*, 151 F.3d. 1124, 1125-26 (8th Cir. 1998).  Furthermore, "[t]he law of case doctrine, which requires 'the trial court to conform any further proceeding on remand to the principles set forth in the appellate opinion, unless there is a compelling reason to depart,' is applicable to judicial review of administrative decisions." *Wilder v. Apfel*, 153 F.3d 799, 803 (7th Cir. 1998) (citations omitted). Thus, it requires an ALJ, on remand from a district court, to conform its additional proceedings to the principles set forth in the remand order of the district court, unless there is a compelling reason to depart. *Id.* at 803.

In this Court's previous decision, Judge Magnuson remanded this case to the Commissioner for further consideration. ("remand order") (T. 496-500.)  The instructions of this Court were very clear.

The two FCA's performed by Dr. Komoto

The ALJ, in his first decision, rejected the two FCAs performed by Dr. Komoto in 2001 because he found them to be unreliable as he believed there were inconsistencies between Dr. Komoto's treatment notes and the conclusions in the FCAs.  (T. 441.)

The remand order stated that "the record in this case, when viewed as a whole, establishes that Dr. Komoto's conclusions in the FCA are not inconsistent with the other medical evidence."  (T. 497.) Judge Magnuson concluded that "the inconsistencies that the ALJ found are insignificant and do not provide support for failing to assign controlling weight to Dr. Komoto's opinions."  (T. 498.)

Nonetheless, the ALJ ignored the remand order when he asserted that "Dr. Komoto's

18

conclusions are not supported by objective medical findings, with the evidence strongly suggesting that

Dr. Komoto based these conclusions on the claimant's subjective complaints." (T. 449.) However,

the ALJ failed to cite to any evidence. The ALJ also stated that the limitations set forth in the FCA

conducted on June 29, 2001 are "dramatically different than those set forth by Dr. Komoto just four

months earlier, in his February 7, 2001 medical assessment." (*Id.*) However, the two FCAs are very

similar and both limit Plaintiff to less than full time work.

Generally, "a treating physician's opinion is due controlling weight [in a social security disability

benefits case] if that opinion is well-supported by medically acceptable clinical and laboratory

diagnostic techniques and is not inconsistent with the other substantial evidence in the record." *Hogan*

*v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001) (quotations omitted); 20 C.F.R. § 404.1527(d)(2). "The

ALJ may discount or disregard such an opinion if other medical assessments are supported by superior

medical evidence, or if the treating physician has offered inconsistent opinions." *Hogan*, 239 F.3d at

961.

Here, the remand order already established that the conclusions in the FCAs were not

inconsistent with the other medical evidence. The ALJ's rejection of Dr. Komoto's June 29, 2001

FCA opinion is conclusory. The ALJ offered no example of "strong" evidence nor did the ALJ explain

how the two FCAs were "dramatically different."

<u>The FCA performed by Mr. Kay</u>

The ALJ in his fist decision did not give Mr. Kay's FCA any significant weight because the test

results were only "conditionally valid." Instead, the ALJ relied on the IME's opinion, who found that

the reasons for the inconsistent results were Plaintiff's de-conditioning and her failure to fully participate in the test.

Judge Magnuson stated in his remand order that "the ALJ's reliance on the IME's determination was misplaced" because "[t]here was substantial evidence in the record from which the IME or the ALJ could have concluded that the inconsistencies in the FCA resulted not from any shirking on Plaintiff's part but rather on the fact that physical exertion seriously exacerbates her pain." (T. 498-99.)   Notably, Judge Magnuson concluded that "[t]he ALJ should not have disregarded the results of the FCA."  (T. 499.)

Nonetheless, the ALJ rejected the results of the FCA performed by Mr. Kay despite this Court's remand order.  The ALJ stated in his second decision that this FCA was "not an accurate reflection of claimant's true physical capabilities . . . [and] afforded little weight to this functional assessment . . . ."  (T. 449.)  ALJ Thomas simply relied on Mr. Kay's opinion that the test was "conditionally valid."  (*Id.*)  However, the ALJ's analysis is essentially the same analysis he used in his first decision, which this Court rejected.  Judge Magnuson's conclusion in the remand order was quite clear when he stated that "[t]he ALJ should not have disregarded the results of the FCA." Furthermore, the results of Mr. Kay's FCA are consistent with the results of Dr. Komoto's two FCAs because both limit Plaintiff to less than full time work and detail her physical restrictions.

Plaintiff's Credibility

In determining the credibility of a claimant's subjective complaints, the ALJ looks to several factors as set out in *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984).  These factors include: (1)

daily activities; (2) duration, frequency and intensity of pain; (3) dosage and effectiveness of medication; (4) precipitating and aggravating factors; and (5) functional restrictions. *Id.* at 1322. These factors must be considered in the light of "the claimant's prior work record, and observations by third parties and treating and examining physicians . . . ." *Id.* "[A]n ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them." *Goff v. Barnhart*, 421 F.3d 785, 792 (8th Cir. 2005) (citations omitted). An ALJ may, however, discount a claimant's subjective complaints if the complaints are inconsistent with the record as a whole. *Id.* at 792.

An ALJ who determines that a claimant's subjective complaints lack credibility must "make an express credibility determination explaining his reasons for discrediting the complaints." *Novotny v. Chater*, 72 F.3d 669, 671 (8th Cir. 1995) (quoting *Ghant v. Bowen*, 930 F.2d 633, 637 (8th Cir.1991)).

The Court will examine the factors set forth in *Polaski* and the ALJ's treatment of them, to determine whether the ALJ reached an appropriate conclusion regarding Plaintiff's credibility.

(1) Daily Activities

The ALJ stated that Plaintiff's daily activities, although somewhat reduced, show that she is "still able to perform housework, she cooks twice a week, is able to do light driving, and is able to maintain concentration when reading a newspaper and watching television, she does laundry, and does all of her personal care." (T. 446.)

However, the Court finds that the record does not reveal inconsistencies of a substantial nature

21

in support of the ALJ's credibility determination.  It should be noted that the court "has repeatedly observed that the ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work."  *Burress v. Apfel*, 141 F.3d 875, 881 (8th Cir. 1998) (citations omitted).

Plaintiff testified that her activities are limited and some require the assistance of her children. (T. 48.)  Plaintiff stated that she is depressed, lacks energy and lays around the house.   Plaintiff testified that she does not do any cleaning, needs help with the laundry, and cooks only once or twice a week. (*Id.*)  Plaintiff testified that her daughter does the dishes and helps her with grocery shopping. (*Id.*)

Plaintiff's husband, Mr. Sersen, confirmed Plaintiff's limited activities.  Mr. Sersen testified that Plaintiff was happy, very active, and an outgoing person before she was injured.  (T. 70-71.)  He explained that when Plaintiff engages in activities, she experiences pain in her neck and then the pain goes to her head, which leads to headaches, nausea and vomiting.  (T. 64-70.)  Mr. Sersen testified that Plaintiff experiences severe headaches which require her to take medication and rest in bed..  (T. 68.)

Furthermore, Judge Magnuson stated in his remand order that "Plaintiff's testimony regarding her regular activities cannot be separated from her other testimony that she engaged in many of these activities only with help from her children and that often these activities caused Plaintiff to suffer migraine headaches.  The ALJ could not have relied on Plaintiff's credibility to support his determination in this case." (T. 499.)  This Court concludes that these allegations are consistent with Plaintiff's complaints to her physicians, and finds this factor weighs in her favor.

<u>(2) Duration, Frequency, and Intensity of Pain</u>

Plaintiff indicated that she takes Vicodin three times a week and a muscle relaxer for her pain and headaches. (T. 568.)   She stated that her headaches occur at the same frequency since she last testified. (T. 581.)  Plaintiff also indicated that she tries to take her medication at the first sign of pain and will lay down. (*Id.*)  She also explained that her headaches are associated with vomiting. (*Id.*)  Plaintiff testified that she has had constant neck and shoulder pain, which increases with activity. (T. 569.)   She stated that her right arm is limited in function due to pain and she has trouble using it for lifting, reaching, and repetitive movements. (T. 579-80) .  Mr. Sersen also confirmed the duration, frequency, and intensity of Plaintiff's pain. (T. 586.)   Furthermore, Dr. Komoto's notes confirms that Plaintiff's pain is ongoing.  The record in this case shows that Plaintiff has persistently sought medical care and prescription medication since her injury in 1992.  Plaintiff's headaches are sometimes associated with vomiting and her medication sometimes makes her drowsy which affects her daily activities or concentration. (T. 59-62, 71-72, 583.)  The Court also finds that Plaintiff's allegations of constant neck and shoulder pain and her limited use of her right arm are consistent with her complaints to her doctors.  Thus, this factor weighs in Plaintiff's favor.

<u>(3) Precipitating and Aggravating Factors</u>

The record shows that Plaintiff's pain started when she was hit by a ladder in the back of her neck as she was cleaning a day care. (T. 577-78.)  Dr. Komoto noted that Plaintiff suffers "from chronic cervical pain along with right shoulder and right arm pain" and believed that "this condition is result of her work injury on July 20, 1992." (T. 307.)  Dr. Komoto also noted that "[o]bjective testing

showed a torn disk at C7 and degeneration of C5-6 . . . [and] a key functional assessment in May 1999 identified significant limitations with the use of her right arm." (*Id.*)  Moreover, Plaintiff aggravated her condition when she underwent physical therapy.  (T. 316.)  The Court finds that the ALJ erred in discounting the credibility of these allegations and finds that this factor weighs in Plaintiff's favor.

(4) Dosage, Effectiveness, and Side Effects of Medication

Plaintiff has been prescribed various medications to control her pain, headaches, hypertension, depression, and sleep.  (T. 516.)  The main side effect noted by Plaintiff is drowsiness which tends to affect her daily activity and concentration.  (T. 582-83.)  Plaintiff also underwent approximately 100 doctor and physical therapy sessions since August 1998.  (Docket No. 8, pg 32.)  She underwent trigger point injections, pool therapy, and various courses of physical therapy, which did not help her condition.  (*Id*.)

The ALJ noted that Plaintiff did not seek psychiatric treatment for her depression and did not report any headache pain during her multiple clinic visits from October 2002 to February 2004, but reported only minor medical problems during this time.[12] (T. 448.)  However, the Court is not persuaded that such inconsistencies are of such a substantial nature as would support the ALJ's credibility determination.  The ALJ cannot highlight individual inconsistencies and ignore the rest of the record.

_____

[12]The record reflects that Plaintiff complained of headaches to her doctor on November 8, 2002. (T. 530.)  Plaintiff also testified that she began to treat her headaches at home through medication prescribed by her doctor. (T. 581.)

(5) Functional Restrictions

Plaintiff testified that her driving is limited to ten or fifteen minutes because it is difficult for her sit

longer.  (T. 41-42.)  She testified that she has pain in her hips which makes it difficult for her to walk

more than fifteen to twenty minutes.  (T. 43-44.)  Plaintiff also testified that she has had constant neck

and shoulder pain, which increases with activity.  (T.  569.)   She stated that her right arm is limited in

function due to pain and she has trouble using it for lifting, reaching, and repetitive movements.  (T.

579-80.)

Dr. Komoto opined that Plaintiff was capable of only low stress jobs that limited her to sitting

for about four hours and standing or walking for two hours in an eight hour workday (with normal

breaks.)  Dr. Komoto also indicated that Plaintiff is unable to use her right arm for any activity.  (T.

379-80.)   Furthermore, Dr. Komoto opined that Plaintiff's pain would often interfere with her attention

and concentration.  (T. 413-14.)  Dr. Komoto estimated that the Plaintiff would likely miss work more

than four times a month due to her impairments or treatment. (T. 416.)  Both Mr .Kay and Dr.

Komoto's opinions indicated that Plaintiff would be limited to part time work.  Thus, the Court finds

that the record is devoid of any evidence of substantial weight which is inconsistent with Plaintiff's

testimony regarding her physical limitations.

Defendant argues that even if ALJ Thomas had failed to discuss each *Polaski* factor, the court

should not reverse the decision if the ALJ gave good reasons why he discounted the complaints.

[Docket No. 20]  *See Dunahoo v. Apfel*,  241 F.3d 1033, 1038 ( 8th Cir. 2001) ("If the ALJ

discredits a claimant's credibility and gives a good reason for doing so, we will defer to its judgment even if every [*Polaski*] factor is not discussed in depth.").

Here, the ALJ cited the *Polaski* case, but failed to fully discuss these factors and did not supply good reasons to discount Plaintiff's complaints of disabling pain. Thus, the ALJ made it impossible for this Court to properly review his determination. *See Cline v. Sullivan*, 939 F.2d 560, 565 (8th Cir. 1991) (finding that the ALJ "inadequately explain[ed] the inconsistencies relied upon in disbelieving [Plaintiff's] allegations of pain and [therefore did] not reveal that the [Plaintiff's] credibility was evaluated according to the factors set forth in *Polaski*.").

The Hypothetical Posed to the Vocational Expert

Plaintiff argues that the ALJ did not pose a proper hypothetical question to the VE which set forth the limitations and restrictions as determined by the treating doctors and the FCAs.

"A hypothetical question posed to the vocational expert is sufficient if it sets forth impairments supported by substantial evidence in the record and accepted as true." *Goff*, 421 F.3d at 794 (quoting *Hunt v. Massanari*, 250 F.3d 622, 625 (8th Cir. 2001)). The hypothetical question posed to the VE "must state *with precision* the physical and mental impairments of the claimant." *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987). (emphasis added); *See also Ludden, v. Bowen*, 888 F.2d 1246, 1249 (8th Cir. 1989) ("An ALJ must include in his hypothetical any allegations of pain or set forth his reasons for excluding them.").

The hypothetical question posed by the ALJ to the VE was incomplete. Notably, the ALJ ignored Judge Magnuson's remand order. Judge Magnuson stated that "the ALJ's hypothetical failed

26

to include the fact that Plaintiff's migraines were frequently accompanied by vomiting and nausea. The hypothetical question thus could not constitute substantial evidence to support the ALJ's decision because it failed to include all of Plaintiff's impairments." (T. 499-500.) Here, the ALJ failed to include this same fact in the hypothetical posed to the VE in the supplemental hearing. In addition, the ALJ failed to state with precision the impairments and limitations noted by Dr. Komoto's FCA performed on June 29, 2001 and the specific limitations noted by the Mr. Kay in the May 13, 1999 FCA.

In particular, the ALJ failed to include Dr. Komoto's opinion that Plaintiff's pain would often interfere with her attention and concentration. (T. 413). The VE indicated that concentration was key characteristic of the surveillance system monitor job. (T. 597.) The ALJ also failed to include Dr. Komoto's estimation that the Plaintiff would likely miss work more than four times a month due to her impairments or treatment. (T.416.) Notably, the VE stated that tolerated absenteeism in competitive employment is two absences per month and any absences in excess of this would eliminate competitive employment. (T. 595-96.).

The ALJ also failed to include in his hypothetical that Plaintiff would need unscheduled breaks every two to three hours consisting of five to ten minutes in duration. (T. 415.) Again, the VE testified that if an individual exceeded the number of acceptable breaks then this would eliminate competitive employment. (*Id*.) The ALJ also failed to include the limitation that Plaintiff could only sit for four hours in an eight hour day. In addition, the ALJ failed to include Mr. Kay's conclusion that Plaintiff could only work part-time at a sedentary level with the following restrictions: sit up to 45 minutes at one time and stand for 30 minutes at one time, but, she was "not to do either of these for more than three to four

27

hours per shift."  (T. 280-81.)

The VE identified the position of surveillance system monitor as the only job Plaintiff could perform based on the hypothetical.  (T. 592.-93.)  Notably, the VE testified that "if a person is limited to standing and walking for two hours in an eight hour day, and *sitting for fours* in an eight hour day, they'd be incapable of performing full-time employment . . . ." (emphasis added) (T. 597.)   The ALJ failed to include such limitations in his hypothetical question to the VE.

The ALJ in his decision to deny benefits to Plaintiff discounted the FCA performed by Dr. Komoto on June 29, 2001, and gave little weight to the FCA performed by Mr. Kay on May 13, 1999.  (T. 449.)  The ALJ concluded that the FCA performed by Dr. Komoto on February 7, 2001, was "a more accurate reflection of the claimant's true physical capabilities."  (*Id.*)  As discussed above, the ALJ failed to  follow the mandate of Judge Magnuson's remand order and therefore his omission of such limitations constitutes an inappropriate hypothetical question.  Furthermore, the ALJ's failure to include all of the limitations in his hypothetical, rendered the VE's answer invalid.[13]  *See e.g., Ludden,*, 888 F.2d at 1249 (finding that the ALJ's hypothetical questions to the VE were defective and consequently the ALJ improperly based his findings upon the VE's answers to them).

## VIII.   CONCLUSION AND RECOMMENDATION

The Court finds that the record establishes disability.  Accordingly, the Court **recommends** that Plaintiff's Motion for Summary Judgment [Docket No. 7] **be granted** and the Commissioner's

---

[13]  The Court does not address the issue of whether the surveillance system monitor job is unskilled or semi-skilled according to the DOT because the ALJ failed to pose a proper hypothetical.

Motion for Summary Judgment [Docket No. 19] **be denied.**

Dated:_11/16/06_____

s/ Arthur J. Boylan_____

Arthur J. Boylan

United States Magistrate Judge

**NOTICE**

Pursuant to Local Rule 72.2 (b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection.  This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals.  Written objections must be filed with the Court before **December 1, 2006.**